# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
## WHITE PLAINS DIVISION

| | |
|---|---|
| CASSIDY LEE, CARLA LOWN, FREDERICK ROZO, and GALINA WIND, on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| PEPSICO, INC.; and WALMART INC., | |
| Defendants. | |

Plaintiffs Cassidy Lee, Carla Lown, Frederick Rozo, and Galina Wind ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against PepsiCo, Inc. ("Pepsi") and Walmart Inc. ("Walmart") (collectively, "Defendants"), pursuant to Rule 23 of the Federal Rules of Civil Procedure, for violating federal antitrust law and state antitrust and consumer protection laws.

## I.     NATURE OF THE CASE

1.     Plaintiffs challenge an agreement between Pepsi, the second largest beverage and processed food manufacturer in the world, and Walmart, the largest retailer in the world, to inflate and maintain wholesale and retail prices for Pepsi's bottled soft drinks ("Pepsi soft drinks") above competitive levels.

2.     Since at least 2018, Pepsi and Walmart have coordinated to suppress wholesale and retail competition for Pepsi soft drinks so that both companies can charge higher-than-competitive prices (the "Scheme").

3.     This Scheme has two components. First, Pepsi agreed to police retail prices at Walmart's competitors, and to require retailers of Pepsi soft drinks to charge their retail customers no less than Walmart's retail prices for Pepsi soft drinks. Competing retailers that did *not* raise their retail prices voluntarily risked a series of escalating, targeted wholesale price increases until undercutting Walmart became infeasible. By preventing retail price competition for Pepsi soft drinks through these mechanisms, Pepsi enabled Walmart to charge supracompetitive retail prices while still claiming the lowest retail prices in the market.

4.     Second, in return for Pepsi's actions to shut down retail price competition and protect Walmart's "price leadership", Walmart agreed to accept inflated *wholesale* prices from Pepsi. Absent Pepsi's actions to shut down retail price competition, Walmart would have required Pepsi to lower its wholesale prices so that Walmart could compete with lower market

retail prices while maintaining the same or similar profit margins. Indeed, when Pepsi *failed* to adequately police competing retail prices, this is exactly what Walmart did. In exchange for Pepsi's efforts to inflate retail prices, however, Walmart agreed to accept Pepsi's higher wholesale prices.

5.     These two components – Pepsi and Walmart's agreement (1) to inflate retail prices for Pepsi soft drinks at non-Walmart retailers, and (2) to inflate the wholesale prices Pepsi charged for its soft drinks – comprised the unlawful Scheme.

6.     The Scheme was facilitated by Pepsi's market power in the market for soft drinks and highly concentrated soft-drink market in which Pepsi, the Coca-Cola Company ("Coca-Cola"), and Keurig Dr. Pepper Inc. ("Dr. Pepper") collectively account for roughly 93 percent of sales. In such an oligopolistic market, price increases by one dominant firm –here, Pepsi – often beget matching increases by others, and retail price-fixing agreement such as the one alleged here can facilitate such coordination.

7.     The Scheme was anticompetitive. First, it eliminated intra-brand retail price competition by preventing lower-cost, lower-margin retailers from undercutting Walmart on Pepsi soft drinks. This directly harmed consumers by inflating retail prices for Pepsi soft drinks, both those charged by Walmart as well as those charged by other retailers.

8.     Second, the Scheme also reduced inter-brand competition at wholesale by insulating Pepsi from demands by Walmart and other large retailers for lower wholesale prices that would otherwise support competitive retail pricing. The result was higher wholesale prices for Pepsi. It further reduced wholesale competition between Pepsi and its primary rivals– Coca-Cola and Dr. Pepper, increasing Pepsi's market power and thus the prices it charged to retailers. The inflated wholesale prices for Pepsi soft drinks (and Coca-Cola and Dr. Pepper soft

drinks) were then passed on to consumers as higher retail prices.

9.    Walmart has used similar tactics with other major suppliers. Walmart routinely uses its power as the world's largest retailer – and its suppliers' largest and most important customer – to require its large suppliers to police and inflate competing retail prices. For instance, at the same time that Pepsi agreed to ensure Walmart's "price leadership" by inflating competitors' prices, Energizer Holdings, Inc. ("Energizer")—another oligopolistic supplier in a highly concentrated industry—made a nearly identical commitment at Walmart's behest.[1] There, as here, Energizer agreed to impose targeted wholesale price increases on customers selling below Walmart's retail price in order to get the customers to "revise . . . [retail] pricing and get . . . off [Walmart's] radar."[2]

10.    As the District Court observed in denying Defendants' motion to dismiss a similar indirect purchaser complaint challenging Walmart's arrangement with Energizer, absent an agreement with Walmart, these efforts to *raise* competing retail prices would make little sense: "If Energizer was independently pursuing its own interests, then for any given wholesale price, Energizer would generally be motivated to *minimize* the ultimate retail prices — thereby maximizing sales and ultimately its profits."[3] The fact that Pepsi sacrificed its own sales by *raising* retail prices, conversely, reflected "that the two businesses had a shared understanding of the mutual benefits their coordinated conduct would create."[4]

11.    Indeed, in internal documents, Pepsi left no doubt that its efforts to inflate

---

[1] *See* Compl., *Copeland v. Energizer Holdings, Inc.*, No. 5:23-cv-02087 (N.D. Cal. Apr. 28, 2023), ECF No. 1.

[2] *Id.* ¶ 80.

[3] *Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 764 (N.D. Cal. 2024).

[4] *Id.*

competing retail prices were pursuant to an agreement with Walmart. As Pepsi wrote of its targeted wholesale price increases on customers with sub-Walmart retail prices, it needed to "begin to CLOSE the gap" at the retail price level because "[w]e absolutely have to demonstrate progress [to Walmart] in the immediate term." Energizer, in furtherance of its own agreement, stated in similar terms: "This is 1000% about Walmart and wanting the best price."[5]

12.    Pepsi's and Energizer's agreements to nearly identical arrangements with Walmart demonstrate that Pepsi's efforts to inflate competing retail prices were not isolated or unilateral, but Walmart's broader practice of colluding with key suppliers to claim "price leadership" without avoiding true price competition.

13.    As a result of the Scheme, Plaintiffs and other consumers paid inflated prices for Pepsi soft drinks.

14.    The scheme began at least as early as January 1, 2018, and continues to the present day (the "Relevant Time Period").

15.    Plaintiffs bring this action on behalf of themselves individually and on behalf of an indirect-purchaser class (the "Class") consisting of all persons and entities in Repealer Jurisdictions during the period from January 1, 2018 through and until the anticompetitive effects of Defendants' challenged conduct crease (the "Class Period"). A Repealer Jurisdiction is a state, district, or territory that has repealed the bar on indirect purchaser plaintiffs recovering under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and includes: Arkansas, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota,

---

[5] *Compl.* ¶ 83, *Copeland*, No. 5:23-cv-02087.

Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. Plaintiffs bring this action against Defendants for injunctive relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and for treble damages under the antitrust laws and consumer protection laws of the several states.

## II.    THE PARTIES

16.    Plaintiff Cassidy Lee is a resident of Topock, Arizona and a citizen of the United States. Throughout the Class Period defined below, Ms. Lee has purchased Pepsi soft drinks in Arizona from Dollar General and Smith's for her own use and not for resale. Ms. Lee has paid supracompetitive prices for each Pepsi soft drink she purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

17.    Plaintiff Carla Lown is a resident of Waterloo, Iowa and a citizen of the United States. Throughout the Class Period defined below, Ms. Lown has purchased Pepsi soft drinks in Iowa from Fareway for her own use and not for resale. Ms. Lown has paid supracompetitive prices for each Pepsi soft drink she purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

18.    Frederick Rozo is a resident of Rancho Santa Margarita, California and a citizen of the United States. Throughout the Class Period defined below, Mr. Rozo has purchased Pepsi soft drinks in California from Pavilions and Target for his own use and not for resale. Mr. Rozo has paid supracompetitive prices for each Pepsi soft drink he purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

19.    Plaintiff Galina Wind is a resident of McHenry, Maryland and a citizen of the United States. Throughout the Class Period defined below, Ms. Wind has purchased Pepsi soft

5

drinks in Maryland from Shop 'n Save and Martin's, and in West Virginia from Kroger, for her own use and not for resale. Ms. Wind has paid supracompetitive prices for each Pepsi soft drink she purchased as a result of the violations alleged in this Complaint and has therefore suffered antitrust injury.

20.    Defendant PepsiCo, Inc. ("Pepsi") is a leading manufacturer of beverages and processed foods based in Harrison, New York.

21.    Defendant Walmart Inc. ("Walmart") is the largest company in the world by revenue and operates thousands of retail stores in the United States. Walmart is headquartered in Bentonville, Arkansas.

## III.    JURISDICTION AND VENUE

22.    Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against the Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also bring state law class claims on behalf of the multistate damages class to recover actual and/or compensatory damages, double- and treble-damages as permitted by relevant state laws, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' anticompetitive conduct, which resulted in prices for Pepsi soft drinks being artificially inflated at supra-competitive levels throughout the Relevant Time Period.

23.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337, and Section 16 of the Clayton Act (15 U.S.C. § 26).

24.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members of the class; and at least one member of the class is a citizen of a state different from that of one of the Defendants.

25.     Venue is proper in this District pursuant to Sections 12 and 16 of the Clayton Act (28 U.S.C. §§ 22 and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District; and/or a substantial portion of the interstate trade and commerce affected by the conspiracy described therein was carried out in this District. Specifically, Defendant Pepsi is headquartered in this District, and it has sold its soft drinks to both Walmart and many other retailers within this District. Defendant Walmart operates retail stores within this District, and it has purchased and sold Pepsi soft drinks at stores within this District. In addition, Defendants have directed their unlawful conduct towards retailers located in this District.

26.     This Court has personal jurisdiction over Defendants because during the Relevant Time Period Defendants marketed and sold Pepsi soft drinks in this district and have had substantial contacts within this District in furtherance of the anticompetitive activity alleged herein.

## IV.    FACTUAL BACKGROUND

### A.  Pepsi is a dominant player in the soft drink market.

27.     The U.S. bottled soft drink industry generates roughly $150 billion annually. Pepsi is the second largest manufacturer after Coca-Cola. PepsiCo Beverages North America (PBNA) oversees Pepsi's U.S. and Canadian soft drink operations and generated $27.6 billion in 2023 revenue. Pepsi's major brands include Pepsi, Mountain Dew, Starry, Bubly, Aquafina, Lipton, Pure Leaf, Gatorade, Rockstar, and Starbucks. Pepsi supplies retailers through a network of wholly owned and franchise bottlers. For wholly owned bottlers, Pepsi sets wholesale prices to retailers.

28.     Pepsi serves customers across multiple retail channels, including grocery, drug, convenience, discount/dollar, mass merchandise, and membership clubs. Retailers purchase from Pepsi's bottlers and compete both within and across channels to sell soft drinks to consumers.

29.     Pepsi has significant market power in the retail market for bottled soft drinks, controlling nearly a third of all soft drink sales in the United States. Its only notable competitors are Coca-Cola and, to a lesser extent, Dr. Pepper: Together, the three sell over 90 percent of all carbonated soft drinks in the United States.

30.     The bottled soft drink industry is characterized by high barriers to entry, which reinforces Pepsi's market power. Perhaps the most visible barrier to entry in the bottled soft drink market is advertising. For more than 50 years, Pepsi and its main rival, Coca-Cola, have engaged in the well-documented "Cola Wars" to compete for consumer loyalty through mutually targeted advertising campaigns. Today, Pepsi spends upwards of $3 billion dollars annually on advertising, achieving near-universal brand recognition. Many food and beverage retailers view Pepsi soft drinks as must-carry items; those that do not stock them face competitive disadvantages.

31.     Access to nationwide manufacturing, bottling, and distribution network is another barrier. Coca-Cola, Pepsi, and Dr Pepper rely on combinations of wholly owned and independent bottlers developed over more than a century, since Coca-Cola first pioneered the bottler-distributor model in the late 1800s. Independent bottlers operate under exclusive territorial agreements to manufacture and distribute products. Pepsi then employs what it calls its "Direct-Store-Delivery" logistics system to facilitate direct delivery from its wholly owned and independent bottlers to retailers across the country.

32.     Without these bottler networks, entrants cannot match incumbents' economies of scale or reach. Access to bottlers, in turn, depends on multibillion-dollar investments in advertising and brand equity that drive consumer demand for bottled products. The bottlers' pivotal role—and the scale required to join their networks—creates a substantial barrier to entry for smaller would-be competitors.

**B. Walmart's retail dominance makes it indispensable to soft drink suppliers, leading Pepsi to guarantee Walmart's retail "price leadership"**

33.     Walmart is the dominant U.S. retailer of soft drinks. It operates more than 4,700 stores in every state and nearly every metropolitan area. By its estimate, 90% of Americans live within ten miles of a Walmart.

34.     Walmart's dominance in the retail market makes it indispensable to its suppliers and gives it significant buyer power. Many Walmart shoppers purchase a full basket of household goods and are unlikely to buy soft drinks elsewhere, so losing Walmart can mean losing those consumers entirely. Reflecting Walmart's importance, Pepsi's Form 10 K identifies Walmart as its most important customer: "In 2024, sales to Walmart Inc. (Walmart) and its affiliates, including Sam's Club (Sam's), represented approximately 14% of our consolidated net revenue . . . the loss of this customer would have a material adverse effect on our [North America] divisions."

35.     To mitigate the risk of losing Walmart, Pepsi makes significant concessions, including working with Walmart to maintain a retail "price gap" or "price hedge" that ensures Walmart's prices are lower than competitors'. This "price gap" functions to give Walmart an advantage over its competitors in the retail market for Pepsi soft drinks. Pepsi has worked with Walmart to maintain a price gap since at least 2018.

36.     Pepsi's business documents describe maintaining Walmart's "price gap" – what

Walmart referred to as ensuring retail "price leadership" – as a "foundational commitment," and state that "[d]elivering on Walmart hedge commitments is an aligned commercial strategy". As one internal Pepsi email put it, "stay[ing] focused on our price gap . . . is how we win with Walmart—[w]e stay focused on our deliverables and commitments."

37.    Pepsi closely monitors Walmart's "price leadership" using two primary metrics: (1) "price gap," which compares average Walmart prices to other retailers within a timeframe weighted by Walmart volume; and (2) "value hedge," which measures the unweighted percentage difference between Walmart's average retail price and that of other retailers. Each metric compares Walmart to the "rest of market" (ROM), which includes multi outlet or multi channel stores in the grocery, club, drug, and dollar channels, excluding Walmart.

38.    Pepsi similarly tracks and seeks to correct for "leakage" of Walmart retail sales to competing retailers due to lower retail pricing at those stores. Pepsi's Vice President of Sales defined "leakage" as the "percentage of consumers that are shifting outside of Walmart to another retailer." A January 2023 Pepsi evaluation observed that erosion of the price gap led to "[a] [h]igh [d]egree [o]f [c]onversion [and] [l]eakage" from Walmart, mostly to grocery, club, and dollar channels. In the words of Pepsi's VP of Sales, where Walmart is "the least competitive there's the greatest share of market loss."

39.    Walmart likewise monitors its "price gap" on Pepsi soft drinks, and the two communicate frequently about whether Pepsi is meeting Walmart's price gap expectations on a short- and long-term basis. Pepsi endeavors to "manage [retail] price gap expectations to longer timeframes," namely, annual and semi-annual timeframes, but it also views monthly and quarterly retail price gaps as "leading indicators" of potential issues with Walmart. Walmart's buyers (employees responsible for negotiating purchases from manufacturers such as Pepsi)

10

would receive "Price Gap" reports before planned meetings with Pepsi executives and would discuss how to address specific gaps.

40.    When Pepsi fails to successfully protect Walmart's retail "price leadership," as evidenced on these "Price Gap" reports, Walmart expresses in no uncertain terms its dissatisfaction and its expectation that Pepsi will take swift action against specific undercutting retailers.

41.    For instance, in 2019, Pepsi became aware that a competing retailer was aggressively cutting retail prices on 12-pack Pepsi soft drinks. Pepsi executives recognized that Walmart would react poorly to these lower prices on the Price Gap report, and that Walmart would demand action. As a Pepsi executive wrote: "[The competitor has] now had multiple weeks of very aggressive pricing and [Walmart senior buyer] will receive a Price Gap report just prior to when [Pepsi executive] is visiting with him about how we move forward on 12pk [twelve-pack cartons of Pepsi soft drinks]."

42.    Likewise, in October 2020, Walmart's senior beverage buyer emailed Pepsi's Senior Director of Sales to complain about a Target promotion featuring discounts on eight packs of Bubly 12-ounce cans. Walmart's buyer expressed frustration that Pepsi "continue[d] to undermine [Walmart's] price leadership with our competition." The Pepsi Senior Director responded: "[W]e understand the importance of finishing strong and that price leadership is key. With that context, the data we have indicates [Walmart's] price leadership with [B]ubly is advantaged versus the market and prior year" and that "[Walmart] has an advantaged price gap on [B]ubly v[ersus] [rest of market] and Target."

### C. Pepsi and Walmart agree to ensure Walmart's price leadership by raising competing retail prices

43.    Walmart did not respond to Pepsi's failure to prevent competitive retail pricing – what it referred to as "undermin[ing] [its] price leadership with our competition" – solely with complaints. Instead, it demanded that Pepsi take specific, concrete actions to restore Walmart's price leadership. As one Pepsi executive noted in an email, if Pepsi's monthly or quarterly retail price gaps are "out of balance" with Walmart's expectation, Walmart "will pressure [Pepsi] for actions."

44.    In a competitive market, if Walmart hoped to restore "price leadership" against lower-priced competitors, it would have to cut its retail prices for soft drinks to match those competitors. And if it wanted to do so while maintaining its profit margins, it would have to demand a corresponding wholesale price cut from Pepsi to subsidize its retail price cut.

45.    Instead, Walmart and Pepsi adopted the Scheme to use their combined market power to raise rival's prices. Walmart agreed not to cut Walmart retail prices (and thereby force Pepsi wholesale cuts) if Pepsi targeted lower-priced competitors and took steps to lift those rivals' retail prices above Walmart's preferred level. When Pepsi or Walmart identified sustained discounting by these "offenders," they agreed that Pepsi would take action to punish these retailers to restore Walmart's retail price advantage.

46.    Pepsi's internal communications make clear it raised competing retail prices to avoid lowering prices at Walmart. In 2021, Pepsi's Pricing Council—senior executives coordinating pricing strategy—assessed a "price gap risk" from grocery chains "battling" for share by cutting Pepsi retail prices. Its talking points presented a two-option "decision tree," also described as Walmart's "hedge": "1. Raise non-[Walmart] customers through Q1 to prevent price risk," or "2. Manage hedge" by cutting Walmart wholesale and retail prices.

47.    Where "feasible", Pepsi chose the first option: "moving [the offender's

retail pricing] up to correct hedge." One example of Pepsi's efforts to raise competing retails pursuant to its agreement with Walmart involved Food Lion, a large regional supermarket chain that operates over 1,000 stores in 10 states. In 2022, Pepsi became aware that Food Lion had "heavily indexe[d]" its retail prices "against retails at [Walmart] and Kroger" and "set[] retails relative to these competitors." For this competitive conduct, Pepsi characterized Food Lion as the "worst offender" violating its price leadership commitment by "beating [Walmart] in price." In response to these lower retail prices, Pepsi designed a multi-year plan to raise Food Lion's retail prices – emphasizing that Pepsi "must commit to raising rate [on Food Lion] faster than market." This plan included a combination of targeted wholesale price increases – "[r]ais[ing] rate across core [soft drink] packages" – and reductions in promotional payments and allowances – "[r]educ[ing] holiday [promotion]" lengths, "[r]ais[ing] promo[tion]" price, and "scal[ing] back on promoting multiple core packages in the same week" – until Food Lion had no choice but to raise its retail prices to make its sales of Pepsi soft drinks profitable.

48.      Pepsi left no doubt that it undertook this effort pursuant to its agreement with Walmart to raise retail prices: Pepsi leadership urged the Food Lion sales team to "CLOSE the gap" on retail pricing because "[w]e absolutely have to demonstrate progress [to Walmart] in the immediate term."

49.      Indeed, for Walmart, there was nothing unusual about its agreement with Pepsi to monitor and inflate competing retail prices, as Walmart uses its dominant market position to induce many of its suppliers to enter similar arrangements. For instance, at the same time that Pepsi agreed to ensure Walmart's "price leadership" by raising Food Lion's retail prices, Energizer Holdings, Inc. ("Energizer") – another large supplier in a highly concentrated

industry – made a nearly identical commitment at Walmart's behest.[6] In 2021, Energizer imposed a targeted retail price increase on a customer pricing below Walmart's retail price to "revise his [retail] pricing and get him off [Walmart's] radar."[7] There, as here, Energizer made crystal clear that its retail-price-maintenance efforts were undertaken pursuant to an agreement with Walmart, writing: "This is 1000% about Walmart and wanting the best price."[8] Energizer's agreement to a nearly identical arrangement with Walmart demonstrates that Pepsi's efforts to raise prices at Food Lion and other discount retailers were not isolated but reflect Walmart's practice of coordinating with suppliers to claim "price leadership" without competing on price.

### D. When Pepsi failed to successfully raise competitors' retail prices, Walmart imposed wholesale and retail price cuts through forced "rollbacks"

50.     By raising competitors' retail prices to Walmart's preferred level, Pepsi aimed to restore Walmart's price leadership *without* requiring Walmart to compete on price. This agreement allowed Walmart to maintain inflated retail prices (because it did not need to match cheaper rivals) and allowed Pepsi to maintain inflated wholesale prices (because it did not need to discount to subsize lower retail prices elsewhere).

51.     Indeed, when Pepsi was *unable* to successfully "demonstrate progress" on its efforts to raise competing retails above Walmart's level, this wholesale and retail price competition is exactly what occurred, as Walmart forced Pepsi to lower its wholesale prices to fund lower retail prices.

52.     Walmart carried out these wholesale and retail price cuts in part through

---

[6] *See* Compl., *Copeland*, No. 5:23-cv-02087.

[7] *Id.* ¶ 80.

[8] *Id.* ¶ 83.

forced "Rollback" promotions at Walmart stores. Rollback promotions are advertised price reductions at Walmart for specific items, funded in whole or in part by the manufacturer of that item. Sometimes, manufacturers determine it is in their unilateral self-interest to fund Rollback promotions, as heavily advertised price discounts at key times of year (e.g., holidays) can drive sales, increase market share, and improve a manufacturer's profits in the long run.

53.     However, when Pepsi failed to successfully raise Walmart's rivals' retail prices, Walmart weaponized Rollbacks as punishment. Rather than proposing Rollbacks to Pepsi as a mutually profitable venture to drive sales, Walmart *required* Pepsi to fund "Rollbacks" on the affected products so that Walmart could match competing retail prices without sacrificing its profit margin. Walmart's forced Rollbacks thus amounted, in essence, to a wholesale price cut to subsidize lower retail prices. Pepsi agreed to these Rollbacks not because they were in Pepsi's unilateral self-interest but because it had no choice. As Pepsi wrote in its SEC filings, losing Walmart would have a "material adverse effect" on Pepsi's profitability.

54.     In internal communications around these Rollbacks, Pepsi executives emphasized that it undertook these price cuts only begrudgingly. For example, in 2019, immediately before meeting with Walmart's senior buyer regarding a "very aggressive" sub-Walmart retailer on the Price Gap report, a Pepsi executive lamented: "I see no way that we do not start a planned [Walmart] Rollback ASAP to help with combatting the price gap challenge that this [price report] will most definitely create."

55.     Moreover, Pepsi made clear that it agreed to these forced wholesale price cuts to match competing retails *only* when it could not raise competing retails sufficiently quickly to placate Walmart. For instance, in December 2021, Pepsi identified a highly

competitive region—the Richmond-Raleigh-Charlotte corridor—in which grocery chains were "battling each other" for market share and driving a "price gap risk" by lowering retail prices. Before agreeing to fund a Rollback, Pepsi's Pricing Counsel sought internal "feedback" on whether it was "feasible" to raise retail prices in that region in the short-term. Only after concluding that "moving Grocery up to correct Hedge is not feasible because of competitive dynamics or previous commitments on price increase timing" did Pepsi agree to a limited, short-term Rollback.

56.     Similarly, Pepsi sought to restrict these Rollbacks to only the minimum scope necessary to placate Walmart and prevent it from taking drastic, nationwide action to reduce retail prices. As a Pepsi employee wrote after agreeing to a regional Rollback on limited products, Pepsi's hope was that these concessions would "[g]et ahead of price gap challenges by showing [Walmart] we are addressing in key spots and *avoid [Walmart] forcing national move*." And even in agreeing to these temporary Rollbacks, Pepsi emphasized that, in the long run, "sustained progress" was feasible on price gaps only by raising competing retail prices: "the above actions are intended to improve [Walmart's] gap performance [on our products]; however, to see sustained progress, in some cases, additional [rest of market] actions" – namely, retail price increases – "will be needed."

57.     Forced Rollbacks thus hung as a looming threat over Pepsi and Walmart's relationship: if Pepsi succeeded in inflating rivals' retail prices to Walmart's preferred level, Walmart would accept Pepsi's preferred wholesale prices; if Pepsi failed, Walmart would impose wholesale cuts to drive down both wholesale and retail prices for Pepsi soft drinks. To avoid such widespread concessions, Pepsi's leadership pressed its Food Lion team to raise Food Lion's retail prices: "We absolutely have to demonstrate progress [to Walmart] in the

immediate term"—or else sacrifice wholesale prices, and profits, to allow Walmart to match the market.

### E.    The Scheme inflated wholesale and retail prices for soft drinks

58.    Absent the Scheme, Walmart would have had no choice but to match lower retail prices for soft drinks and push for across-the-board wholesale price concessions from Pepsi – as it did in limited fashion when it imposed forced Rollbacks – to remain competitive in the soft drink market.

59.    These price cuts would have spread across the market, as competing retailers would have had little choice but to match Walmart's lower prices and demand lower wholesale prices from Pepsi to stay profitable. Pepsi's principal competitors – Coca-Cola and Dr. Pepper – would then have been compelled to follow, producing lower, more competitive pricing across the soft drinks category.

60.    Instead, by eliminating retail price competition, Walmart maintained its preferred retail prices and Pepsi maintained its preferred wholesale prices, avoiding the price war that would have lowered soft drink prices market-wide. With those positions secured, they then leveraged the Scheme to impose highly profitable wholesale and retail price increases on Pepsi soft drinks.

61.    At the wholesale level, Pepsi launched a prolonged series of significant price increases that were made possible by the parties' agreement. In 2019, for instance, Pepsi imposed a market-wide wholesale price increase but exempted Walmart, thus fortifying Walmart's "price leadership" position while providing Pepsi further inflated wholesale profits on its remaining sales. As an internal Pepsi email acknowledged: "Our proposal below is not solely focused on the cost increase but is geared toward how we can continue to keep Walmart advantaged through extremely advantaged costs/retails in order to drive growth on our mutual

businesses."

62.     Pepsi followed this up with a series of substantial, successive wholesale price increases on all customers that would not have been possible absent the Scheme. Between 2022 and 2023, Pepsi raised wholesale prices by double-digit percentages each quarter for *seven consecutive quarters*.[9] In October 2022, commentators observed that these "[p]rice hikes" had "pump[ed] up" Pepsi's profitability, as "PepsiCo's revenues have continuously beaten analysts' expectations quarter after quarter" thanks to its strategy of "pass[ing] on . . . costs to consumers."[10]

63.     On a 2022 earnings call, Pepsi's Chief Financial Officer, Hugh Johnston, admitted that Pepsi's price increases were protected from competition, stating "We increased prices at the beginning of the fourth quarter . . . I actually think we're capable of taking *whatever pricing [increases] we need*."[11] Pepsi's Chief Executive Officer, Ramon Laguarta, echoed this sentiment on a 2023 earnings call, stating: "[O]bviously, we've been able to raise prices and consumers stay within our brand."

64.     At the retail level, Walmart was able to leverage its prevention of retail price competition and softening of wholesale price competition on soft drinks to not only pass on Pepsi's wholesale price increases to consumers but also independently impose further retail price increases – all of which were protected from competition thanks to the Scheme. This combination resulted in a dramatic retail price increase during the Relevant Time Period, with

---

[9] Dee-Ann Durbin, *PepsiCo hikes prices by double digits for the 7th consecutive quarter and profits jump 14%*, Detroit News (Oct. 10, 2023), https://www.detroitnews.com/story/business/retail/2023/10/10/pepsico-hikes-prices-7th-consecutive-quarter-profits-jump/71127783007/.

[10] Maria Monteros, *Price hikes pump up PepsiCo's annual outlook*, ModernRetail (Oct. 12, 2022), https://www.modernretail.co/operations/price-hikes-pump-up-pepsicos-annual-outlook/.

[11] *Id.* (emphasis added).

real prices on soft drinks rising by *over 70 percent* between 2019 and 2023:

FIGURE 1: AVERAGE U.S. PRICE FOR TWO LITER SOFT DRINK



65.     The greatest potential threats to the Scheme were Coca-Cola and, to a lesser extent, Dr. Pepper. They could have attempted to steal market share from Pepsi through lower pricing. But the Scheme reduced their already-limited incentives to do so by facilitating tacit collusion at the wholesale level between these oligopolistic firms.

66.     Together, Coca-Cola, Pepsi, and Dr. Pepper control 93 percent of the carbonated soft drink market. In such a highly concentrated market, when a dominant firm like Pepsi raises prices, the other dominant firms—Coca-Cola and Dr Pepper—weigh whether to undercut Pepsi with lower wholesale prices (likely passed through to consumers as lower retail prices) to gain share at both the wholesale and retail levels, or to avoid triggering a price war that would reduce all three firms' profits. In markets with few firms and repeated interactions, that calculus often yields "conscious parallelism" or "tacit coordination," whereby firms independently set wholesale prices closer to monopoly levels rather than competing aggressively, without any express communication or collusion.

67.     In fact, Coca-Cola has long emphasized its use of conscious parallelism to

19

set prices, referring to its pricing strategy as "meet-the-competition pricing," pursuant to which Coca-Cola expressly sets its prices "on par with those of other soda brands." By broadcasting its intent *not* to compete on price with Pepsi, Coca-Cola ensures Pepsi that it can profitably impose supracompetitive price increases without worrying that Coca-Cola will undercut it to compete for market share.

68.    These tendencies toward coordinated pricing are further heightened by Pepsi, Coca-Cola, and Dr. Peppers's use of the nationwide network of independent bottlers described above. By using standardized regional facilities to manufacture, bottle, and resell their products, Pepsi and its competitors increase the homogeneity of their supply chains and consolidate pricing decisions in shared actors. Indeed, Pepsi and its competitors often use the *same* bottlers, at the *same* time, to reach regional markets, creating myriad opportunities to monitor and coordinate pricing.

69.    Moreover, Pepsi has at times used its wholly owned bottling subsidiaries to manufacture and distribute competitors' products, creating direct opportunities for price coordination. For instance, after Pepsi purchased two of the largest independent bottlers in 2009 for nearly $8 billion, it sought to continue to manufacture and distribute *Dr. Pepper's* soft drinks, which the bottlers had previously done pursuant to independent supply agreements. To do so, Pepsi entered a consent decree with the Federal Trade Commission to remedy the "competitive concern associated with access" by Pepsi to Dr. Pepper's "commercially sensitive confidential information." Despite this consent decree, Pepsi's control over the distribution and sale of its next largest competitor's soft drinks—particularly when combined with Coca-Cola's "meet-the-competition pricing" policy—only further softens the incentives for price competition in the soft drink market and increases the opportunities for price coordination.

70.     Through multiple mechanisms, the Scheme facilitated and enhanced tacit collusion at the wholesale level by increasing Pepsi, Coca-Cola, and Dr. Pepper's incentive and ability to engage in conscious parallelism. By fixing Pepsi's retail prices market-wide at Walmart's preferred level, the Scheme made Pepsi's pricing transparent and easily monitored, enabling Coca-Cola and Dr Pepper to track and match Pepsi's prices. Commentators have long noted that, because retail prices are more observable than wholesale prices, oligopolistic manufacturers can use retail price maintenance to collude directly on retail prices and to monitor and thereby facilitate collusion on wholesale prices.

71.     In addition, the Scheme allowed Pepsi, Coca-Cola, and Dr. Pepper to avoid competing on price by opening another avenue of competition: preserving Walmart's margins. By thwarting retail price competition, Pepsi competed for Walmart's business on a non-price dimension—guaranteeing Walmart higher retail margins free from lower competitive pricing —that did not risk a price war among oligopolistic rivals.

72.     Third, by standardizing retail prices on favorable terms to Pepsi's largest buyers, the Scheme neutralized those buyers' ability to use their bargaining power to disrupt the tacit coordination among Pepsi, Coca-Cola, and Dr Pepper. As Walmart's forced Rollbacks show, a dominant retailer can compel even oligopolistic suppliers to grant discounts and wholesale price cuts to avoid losing its business. Such compelled cuts can trigger a price war by upsetting oligopolistic price equilibrium and prompting rival responses. By agreeing to eliminate retail price competition, Pepsi averted Walmart's threatened Rollbacks and protected Pepsi, Coca-Cola, and Dr. Pepper's abilities to price oligopolistically.

73.     The Scheme's effectiveness in softening inter-brand competition is demonstrated by Figure 1 above, which demonstrates the real prices on *all* soft drinks

increasing by over 70 percent during the Relevant Time Period. If Coca-Cola and Dr. Pepper had responded to Pepsi's inflated prices by competing on price at the wholesale level, one would have expected that price competition to prevent market-wide price inflation, while leading to a decline in Pepsi's market share. Instead, the opposite occurred: Prices increased on soft drinks *across the board*, whether sold by Pepsi, Coca-Cola, or Dr. Pepper. As discussed next, these increases can be explained only by success of the Scheme.

### F.    Pepsi's price increases cannot be explained by market forces.

74.    Pepsi's price increases cannot be explained by competitive market forces, such as demand growth, cost increases, or general inflation.

75.    Increased demand does not explain Pepsi's wholesale price increases for soft drinks. Per-capita soft drink consumption has been in what market analysts describe as a "long-term trend of gradual decline," falling more than 15% since its early-2000s peak and dropping by more than a gallon per consumer annually during the Relevant Time Period. Yet Pepsi raised its prices by double-digits each quarter and saw double-digit profit increases at the same time.

76.    Higher costs or general inflation do not explain Pepsi's wholesale price increases. Commentators observed that Pepsi consistently beat analysts' expectations by raising prices faster than costs during the pandemic. And when inflation was just 3.2% in July and October 2023, Pepsi increased prices by 15% and 11%, respectively.

77.    A December 2025 industry report from FinanceBuzz, "Soda Inflation: Prices Have Bubbled Up Faster Than Inflation Since 2020," using Consumer Price Index data, confirms these trends. It found that, from 2020 to 2025, prices for 2 liter bottles rose 62% while national inflation was 25%, and the average price of 12 pack cans rose 89%, more than triple

the inflation rate during the same period.[12]

78.     The report included the following graph demonstrating the pricing differential above inflation:

FIGURE 2: SODA COST INCREASES, 2020-2025



## V.    THE SCHEME CAUSED AND CONTINUES TO CAUSE ANTITRUST INJURY TO CONSUMERS

79.     Through Pepsi's actions to punish and inflate wholesale prices for retailers like Food Lion that tried to compete with Walmart's retail prices, Pepsi set Walmart's preferred retail price as a price "floor" below which competing retailers could not sell Pepsi soft drinks, even if sub-Walmart retail prices would have been profitable absent the Scheme. This retail

---

[12] FinanceBuzz, "Soda Inflation: Prices Have Bubbled Up Faster Than Inflation Since 2020" (Dec. 2025), https://financebuzz.com/soda-inflation.

price floor inflated retail prices at both retailers like Food Lion that Pepsi targeted directly with its punitive actions, as well as at all other retailers that would have competed with these lower retail prices by lowering their own prices. As a result, the Scheme directly caused inflated retail prices to consumers, including members of the Class.

80.    In exchange for Pepsi's actions to inflate competing retail prices, Walmart agreed to accept Pepsi's inflated wholesale prices, and did not follow through on its threats to impose wholesale price cuts through forced Rollbacks. This agreement then allowed Pepsi to impose numerous additional, double-digit wholesale price increases in the following years. These inflated wholesale prices were passed on as still-higher retail prices to consumers, including members of the Class.

81.    As a result of Defendants' anticompetitive conduct as alleged herein, during the Relevant Time Period, Plaintiffs and other members of the Class indirectly purchased Pepsi soft drinks at artificially inflated prices, which were substantially higher than the prices they would have paid absent Defendants' unlawful conduct. Plaintiffs and members of the Class have sustained losses and damages to their business and property in the form of paying artificially inflated prices ("overcharges"), which are the type of injuries that the antitrust laws were designed to prevent and are a direct and proximate result of Defendants' unlawful conduct. Therefore, Defendants have caused antitrust injury to Plaintiffs and all members of the Class.

## VI.    MARKET POWER AND MARKET DEFINITION

82.    The relevant product market consists of the market for bottled soft drinks. There are no reasonable substitutes for bottled soft drinks. Customers purchasing bottled soft drinks at retail do not view bottled soft drinks as reasonably interchangeable with other types of beverages, such as alcoholic drinks or non-bottled soft drinks. Alcoholic drinks have

obvious mood-altering effects that render them non-substitutable, while non-bottled beverages, such as fountain drinks, usually cannot be purchased at the same retail locations (e.g., supermarkets and convenience stores) as bottled drinks, and cannot be transported and stored for extended periods without spoiling. Nor are soft drinks substitutes for any non-beverage products for virtually any purpose.

83.     The relevant geographic market consists of the United States, and its territories, possessions, and the Commonwealth of Puerto Rico (in conjunction with the relevant product market above, the "Relevant Market").

84.     A hypothetical monopolist in the market for bottled soft drinks could profitably impose a small but significant non-transitory increase in price without causing a significant number of customers to switch to other products.

85.     The fact that Defendants were able to profitably inflate the prices of Pepsi soft drinks shows that there are no sufficiently reasonable substitutes, and therefore that soft drinks are a relevant market.

86.     Pepsi has significant market power within the Relevant Market. It is the second largest manufacturer of soft drinks in the United States with roughly a third of the market. Together with Coca-Cola (the largest) and Dr. Pepper (third-largest), the three control over 90% of U.S. carbonated soft drink sales. Entry is deterred by multibillion-dollar, durable advantages in brand recognition and bottler relationships, which are essential to reaching mass retail.

87.     Walmart likewise wields significant market power in the Relevant Market. As the world's largest company by revenue, it operates more than 4,700 U.S. stores in every state and nearly every U.S. Metropolitan Statistical Area, with about 90% of Americans living

within ten miles of a Walmart. Its dominance makes it indispensable to suppliers and confers substantial buyer power. This market power is heightened by the significant number of captive customers who shop at Walmart for a complete basket of household goods and who are unlikely to leave to buy soft drinks elsewhere. As a result, losing Walmart as a customer means losing a substantial number of retail customers entirely.

88.    Direct evidence establishes Defendants' combined market power in the Relevant Market. That direct evidence includes Defendants' ability to profitably and sustainably inflate prices above competitive levels. It also includes Pepsi's numerous large price increases since January 2019 that were enabled by its agreement with Walmart that cannot be explained based on competitive forces.

89.    As shown by Pepsi's significant price inflation alleged herein, inter-brand competition did not restrain Pepsi from inflating its prices. On the contrary, Pepsi's agreement with Wal-Mart reduced price competition between Pepsi, Coca-Cola, and Dr. Pepper by encouraging Coca-Cola and Dr. Pepper to follow Pepsi's price increases and reducing Coca Cola's and Dr. Pepper's incentives to attempt to compete with Pepsi on wholesale pricing. The agreement also made Pepsi's price changes easier to observe and follow, and prevented Walmart from instigating a price war by forcing Pepsi to compete aggressively with Coca-Cola and Dr. Pepper on price.

## VII.    ANTICOMPETITIVE EFFECTS

90.    Defendants' Scheme caused Walmart's retail competitors to pay inflated wholesale prices for Pepsi soft drinks, which directly undermined those retailers' ability to compete effectively on price at the retail level.

91.    Defendants' Scheme increased Pepsi's market power by reducing competition between Pepsi, Coca Cola, and Dr. Pepper, increasing their incentive to match

Pepsi's price increases, and reducing the risk that Pepsi would lose market share if it inflated its prices above competitive levels.

92.     The Scheme enabled Pepsi to implement a series of anticompetitive wholesale price increases. These price increases started in 2019 and accelerated in 2022 and 2023, when Pepsi raised wholesale prices by double-digit percentages each quarter for seven consecutive quarters. Pepsi executives acknowledged the company's ability to "tak[e] whatever pricing [increases] we need," reflecting that these increases were protected from competitive discipline. These wholesale price increases were passed through by retailers to consumers, resulting in higher retail prices paid by Plaintiffs and Class members.

93.     The price increases identified above cannot be adequately explained by general inflation in the economy or other competitive market forces. The magnitude and persistence of Pepsi's price increases exceeded what would be expected from inflation or ordinary cost pressures in a competitive market.

94.     The Scheme also reduced the likelihood that Walmart would use its buyer power to compel wholesale price cuts that could have triggered market-wide competitive responses. In instances where Pepsi failed to raise competing retailers' prices quickly enough, Walmart's forced Rollbacks demonstrated the capacity of a dominant retailer to compel wholesale concessions; by suppressing retail price competition, the Scheme minimized such disruptive interventions and preserved supra-competitive pricing.

95.     Defendants' Scheme also reduced competition on the retail level by reducing price competition among retailers who sell Pepsi soft drinks. In particular, the Scheme forced competing retailers that attempted to gain market share by offering retail prices lower than Walmart's to increase their retail prices. As a result, retail prices for Pepsi soft drinks

were inflated because innovative or more efficient retailers could not profitably compete with Walmart, other retailers were not pressed to match the lower retail prices that these retailers would have charged.

96.      The collective effect of the Scheme is substantial harm to competition at both whole and retail levels, including impaired intra-brand retail competition, reduced inter-brand competition, sustained supra-competitive wholesale pricing, and inflated retail pricing.

97.      The price increases at the wholesale and retail levels for Pepsi soft drinks were passed through and ultimately borne by Plaintiffs and members of the Class in the form of overcharges.

## VIII.   STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

98.      During the Class Period, Defendants' Scheme was a continuing violation in which Defendants repeatedly invaded Plaintiffs' and Class Members' interests by taking overt acts in furtherance of the Scheme.

99.      Throughout the Class Period, Defendants discussed the Scheme, adjusted it to match new Walmart prices, agreed to new wholesale price increases, and repeatedly enforced their agreement against retailers who attempted to undercut Walmart's retail prices for Pepsi soft drinks.

100.      Throughout the Class Period, Defendants' Scheme repeatedly injured Plaintiffs and members of the Class by causing them to pay overcharges each time they purchased Pepsi soft drinks.

## IX.   EFFECT ON INTRASTATE AND INTERSTATE COMMERCE

101.      The Pepsi soft drinks at issue in this case are sold in interstate commerce, and the unlawful activities alleged herein have occurred in, and have had a substantial effect upon, interstate commerce in the United States.

102.    Defendants' anticompetitive conduct occurred in part in trade and commerce within the Repealer Jurisdictions set forth herein. During the Class Period, Pepsi soft drinks, manufactured by Pepsi, were shipped into each Repealer Jurisdiction and were sold to and paid for by Class members. Defendants conspired in restraint of trade within the intrastate commerce of each Repealer Jurisdiction because Defendants agreed to fix the price for Pepsi soft drinks sold within each of the Repealer Jurisdictions.

## X.    CLASS ACTION ALLEGATIONS

103.    Plaintiffs bring this Action as a class action pursuant to Federal Rule of Civil Procedure and seek certification of a class (the "Class") defined as follows:

> All persons and entities in Repealer Jurisdictions who indirectly[13] purchased Pepsi soft drinks for their own use and not for resale, at any time during the period from January 1, 2018 until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period" or the "Relevant Time Period").

104.    Excluded from the Class are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. Also excluded from the Class are: any federal, state, or local governmental entity; any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified during the course of this action.

105.    **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. Class Members number in the millions.

106.    **Typicality.** Plaintiffs' claims are typical of the claims of members of the Class, who are similarly affected by Defendants' wrongful conduct in violation of the laws

---

[13] Purchases of Pepsi soft drinks directly from Defendants are excluded.

complained of herein. Plaintiffs and all members of the Class were injured in the form of overcharges caused by Defendants' conduct.

107.     Plaintiffs' interests do not conflict with those of members of the Class.

108.     **Commonality.** Questions of law and fact common to the Members of the proposed Class include:

1.     Whether Defendants agreed to increase, fix, or stabilize the prices of Pepsi soft drinks;

2.     The nature, scope, and extent of Defendants' agreement;

3.     Whether that agreement violates the Sherman Act and relevant state laws;

4.     Whether retail competition for sales of Pepsi soft drinks was impaired by Defendants' agreement;

5.     Whether Plaintiffs and Class members were injured by Defendants' agreement;

6.     The appropriate measure of classwide damages for members of the Class; and

7.     Whether injunctive relief to prevent Defendants' agreement from recurring is appropriate and, if so, what injunctive relief is appropriate.

109.     **Predominance.** The common issues above predominate over any issues affecting only individual Class members.

110.     **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by some of the individual Class

members may be relatively small, the expense and burden of individual litigation makes it impractical for individual members of the Class to redress the wrongs done to them. Furthermore, litigating millions of individual cases would inevitably lead to inconsistent rulings and results, burden the judicial and legal system, and magnify the delay and expense to all the parties and the court system through repeated litigation and trial of the same factual and legal issues.

## XI.    COMPLIANCE WITH NOTICE AND DEMAND REQUIREMENTS

111.     In compliance with the requirements of Arizona Rev. Stat. Ann. § 44-1415; Colorado Rev. Stat. § 6-4-116; Connecticut Gen. Stat. § 35-37; Hawaii Rev. Stat. § 480-13.3(a); Minnesota Stat. § 325D.63; Nevada Rev. Stat. § 598A.210(3); New York Gen. Bus. Law § 340(5); Oregon Rev. Stat. § 646.780(5)(b); Rhode Island Gen. Laws § 6-36-21; and Utah Code Ann. § 76-16-511(9), Plaintiffs' counsel sent letter notices to the Attorneys General of Arizona, Colorado, Connecticut, Hawaii, Minnesota, Nevada, New York, Oregon, Rhode Island, and Utah. The letters informed the Attorneys General of the filing of this complaint, identified the relevant state antitrust provisions at issue, and enclosed a copy of this complaint.

112.     Counsel sent demand letters to Defendants regarding this class-action complaint pursuant to Massachusetts General Law Chapter 93A § 9(3). The demand letters identified the claimant as Plaintiffs, in their individual and representative capacity; described the alleged anticompetitive conduct by Defendants; described Plaintiffs' and the class's injury; set forth a demand for relief; and requested an offer to cure within the statutorily prescribed time.

## XII.    CAUSES OF ACTION

### COUNT I
### VIOLATION OF SECTIONS 1 AND 3 OF THE SHERMAN ACT (15 U.S.C. §§ 1, 3) (ON BEHALF OF RESIDENTS IN REPEALER JURISDICTIONS FOR DECLARATORY AND EQUITABLE RELIEF)

113.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation in the preceding paragraphs.

114.    Defendants violated 15 U.S.C. Sections 1 and 3 by entering into, furthering, and/or enforcing an unreasonable restraint of trade. More specifically, Pepsi agreed with Walmart to fix, increase, inflate, or stabilize prices of Pepsi soft drinks.

115.    Defendants' Scheme stifled intra-brand competition by eliminating price competition from discount retailers, such as Portable Power and other retailers that compete with Walmart in the retail market.

116.    Defendants' Scheme also reduced inter-brand competition between Pepsi, Coca-Cola, and Dr. Pepper.

117.    **Defendants Violated the "Rule of Reason"**: The market for bottled soft drinks is a relevant antitrust market. There are no reasonable substitutes for bottled soft drinks. Customers purchasing bottled soft drinks at retail do not view bottled soft drinks are reasonably interchangeable with other types of beverage, such as alcoholic drinks or non-bottled soft drinks.

118.    Pepsi has market power in the market for bottled soft drinks in the United States, controlling approximately one third of the market. This market power is enhanced by the concentrated nature of the soft-drink industry, with just three manufacturers accounting for the vast bulk of sales. There are significant barriers to entry in the bottled soft drink market, due to the existing firms' multibillion dollar investments into durable advantages in brand

32

recognition and relationships with bottlers, without which competitors cannot reach the mass retail market.

119.    Pepsi's market power was enhanced by Pepsi having reached an agreement with the largest retailer in the United States, Walmart.

120.    Walmart has market power in many local "brick and mortar" retail markets, as it is the largest retailer in the United States, and the dominant retailer in many relevant geographic markets.

121.    Walmart used its market power to cause Pepsi to agree to limit price competition from other retailers.

122.    Defendants' Scheme had substantial price effects in the market for soft drinks and therefore on Pepsi soft drinks. Defendants' agreement increased the wholesale price of Pepsi soft drinks substantially, which were then passed on to retail customers including Class Members. The agreement also stifled the competition that should exist between retailers, leading directly to higher retail prices for Pepsi soft drinks.

123.    There is no procompetitive justification for Defendants' Scheme. For example, Pepsi soft drinks are not specialized products that require the retailer to expend resources to explain their use to consumers or to maintain a skilled sales staff that is familiar with their products. Therefore, there are no free-rider justifications for the challenged agreements.

124.    Defendants' Scheme violates the rule of reason under a "quick look" analysis because the anticompetitive effect of their agreements is plain and obvious.

125.    Defendants' Scheme violates the full-blown rule of reason because the agreements harm competition without providing any benefit to any relevant market.

126.     As a result of Defendants' Scheme, prices for Pepsi soft drinks were inflated above competitive levels in the United States.

127.     As a result of Defendants' Scheme, Plaintiffs and Class Members have been injured in their businesses and property in that they have paid more for Pepsi soft drinks than they otherwise would have paid in the absence of that conduct.

128.     With respect to their claim under the Sherman Act, Plaintiffs and Class Members seek injunctive relief and attorneys' fees and costs.

## VIOLATIONS OF STATE ANTITRUST LAWS

129.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation in the preceding paragraphs.

130.     The following Second through Thirty-Two Claims for Relief are pleaded under the antitrust laws of each State or jurisdiction identified below, on behalf of Plaintiffs and members of the Class.

131.     Although each individual count relies upon state law, the essential elements of each state antitrust claim are the same. The above-alleged conduct, which violates the federal Sherman Antitrust Act, will, if proven, establish a claim under each of the state laws cited below.

## COUNT II
## VIOLATION OF ARIZONA UNIFORM STATE ANTITRUST ACT,
### ARIZ. REV. STAT. ANN. §§ 44-1401 *et seq.*

132.     By reason of the conduct alleged herein, Defendants have violated Ariz. Rev. Stat. Ann. Sections 44-1401, *et seq.*

133.     Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington, PLC*, 75 P.3d 99, 101-10 (Ariz. 2003).

134.     Under Arizona law, "[a] contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within this state, is unlawful." Ariz. Rev. Stat. § 44-1402.

135.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Arizona.

136.     Defendants' violations of Arizona law were flagrant.

137.     Defendants' unlawful conduct substantially affected Arizona's trade and commerce and Defendants' unlawful conduct occurred in substantial part in Arizona by fixing the prices charged by retailers for Pepsi soft drinks in Arizona.

138.     As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

139.     By reason of the foregoing, members of the Class are entitled to seek all forms of relief available under Ariz. Rev. Stat. Ann. Sections 44-1401, *et seq*.

## COUNT III
## VIOLATION OF CALIFORNIA CARTWRIGHT ACT,
### CAL. BUS. & PROF. CODE §§ 16700, *et seq.*

140.     The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, governs antitrust violations in California.

141.     California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code §

301.

142.    Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

143.    A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. Cal. Bus. & Prof. Code § 16726.

144.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within California.

145.    Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code Sections 16700, *et seq.*

146.    Defendants' unlawful conduct substantially affected California's trade and commerce and Defendants' unlawful conduct occurred in substantial part in California by fixing the prices charged by retailers for Pepsi soft drinks in California.

147.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of California during the Class Period. But for Defendant's conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

148.    Plaintiffs and members of the Class were injured in their business or property, with respect to purchases of Pepsi soft drinks in California and are entitled to all

forms of relief, including recovery of treble damages.

## COUNT IV
## VIOLATION OF COLORADO ANTITRUST ACT,
## COLO. REV. STAT. §§ 6-4-101, *et seq.*

149.    The Colorado Antitrust Act provides that "Entering into or engaging in any of the following in restraint of trade or commerce is illegal: (a) A contract; (b) A combination in the form of a trust or other form of combination; or (c) A conspiracy." Colo. Rev. Stat. § 6-4-104.

150.    Members of the Class indirectly purchased Pepsi soft drinks within Colorado during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

151.    Under Colorado Law, indirect purchasers have standing to maintain an action under the Colorado Antitrust Act based on the facts alleged in this Complaint. Colo. Rev. Stat. § 6-4-115.

152.    Defendants contracted, combined or conspired to restrain or monopolize trade in the Relevant Market in Colorado in violation of Colo. Rev. Stat. § 6-4-104.

153.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in Colorado, and are entitled to all forms of relief, including recovery of treble damages.

## COUNT V
## VIOLATION OF CONNECTICUT ANTITRUST ACT,
## CONN. GEN. STAT. ANN. §§ 35-24, *et seq.*

154.    The Connecticut Antitrust Act states that "[e]very contract, combination, or conspiracy to monopolize, or attempt to monopolize, or monopolization of any part of trade or commerce is unlawful." Conn. Gen. Stat. Ann. § 35-27.

155.    Members of the Class indirectly purchased Pepsi soft drinks within

37

Connecticut during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

156.    Under Connecticut law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Connecticut General Statutes based on the facts alleged in this Complaint under Conn. Gen. Stat. Ann. § 35-46a.

157.    Defendants contracted, combined or conspired to act in restraint of trade within Connecticut in violation of Conn. Gen. Stat. Ann. Section 35-27.

158.    Defendants' unlawful conduct substantially affected Connecticut's trade and commerce and Defendants' unlawful conduct occurred in substantial part in Connecticut by fixing the prices charged by retailers for Pepsi soft drinks in Connecticut.

159.    Members of the Class were injured in their business or property, with respect to purchases of Pepsi soft drinks in Connecticut and are entitled to all forms of relief, including recovery of treble damages.

**COUNT VI**
**VIOLATION OF DELAWARE ANTITRUST ACT,**
**DEL. CODE ANN. TIT. 6, §§ 2101, *et seq.***

160.    Delaware Antitrust Act declares unlawful "[e]very contract, combination in the form of trust or others, or conspiracy, in restraint of trade or commerce in [Delaware]". Del. Code Ann. tit. 6, § 2103.

161.    Members of the Class indirectly purchased Pepsi soft drinks within Delaware during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

162.    Under Delaware law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint under Del. Code Ann. tit. 6, § 2108.

163.     Defendants contracted, combined or conspired to act in restraint of trade within Delaware in violation of Del. Code Ann. tit. 6, Section 2103.

164.     Defendants' unlawful conduct substantially affected Delaware's trade and commerce and Defendants' unlawful conduct occurred in substantial part in Delaware by fixing the prices charged by retailers for Pepsi soft drinks in Delaware.

165.     Defendants' violations are willful.

166.     Members of the Class were injured in their business or property, with respect to purchases of Pepsi soft drinks in Delaware and are entitled to all forms of relief, including recovery of treble damages.

### COUNT VII
### VIOLATION OF DISTRICT OF COLUMBIA ANTITRUST ACT, D.C. CODE ANN. §§ 28-4501, *et seq.*

167.     The policy of the District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices." D.C. Code Ann. § 28-4501.

168.     Members of the Class purchased Pepsi soft drinks within the District of Columbia during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

169.     Under District of Columbia law, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint under D.C. Code. Ann. § 28-4509(a).

170.     Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, in violation of D.C. Code Ann. Sections 28-4501, *et seq.*

171.     Members of the Class were injured with respect to purchases of Pepsi soft drinks in the District of Columbia and are entitled to all forms of relief, including recovery of treble damages.

## COUNT VIII
## VIOLATION OF HAWAII ANTITRUST ACT,
### HAW. REV. STAT. § 480-4, *et seq.*

172.     Hawaii Antitrust Act provides that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State, or in any section of this State is illegal." Haw. Rev. Stat. §480-4(a).

173.     Members of the Class indirectly purchased Pepsi soft drinks within Hawaii during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

174.     Under Hawaii law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint under Haw. Rev. Stat. §480-3.

175.     Defendants contracted, combined or conspired to act in restraint of trade within Delaware in violation of Haw. Rev. Stat. §480-4(a).

176.     Defendants' unlawful conduct substantially affected Hawaii's trade and commerce and Defendants' unlawful conduct occurred in substantial part in Hawaii by fixing the prices charged by retailers for Pepsi soft drinks in Hawaii.

177.     Members of the Class were injured in their business or property, with respect to purchases of Pepsi soft drinks in Hawaii and are entitled to all forms of relief, including recovery of treble damages.

## COUNT IX
## VIOLATION OF ILLINOIS ANTITRUST ACT,
### 740 ILL. COMP. STAT. ANN. 10/3(1), *et seq.*

178.     Illinois Antitrust Act, 740 ILL. Comp. Stat. Ann. 10/1, *et seq.*, aims "to

promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 Ill. Comp. Stat. Ann. 10/2.

179.    The Act prohibits any contract, combination or conspiracy to fix prices, limit production, or allocate markets. The Act also makes it a violation to establish, maintain, use or attempt to acquire monopoly power "over any substantial part of trade or commerce" in Illinois "for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce." 740 Ill. Comp. Stat. Ann. 10/3.

180.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Illinois during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

181.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 Ill. Comp. Stat. Ann. 10/7(2).

182.    Defendants entered into contracts or engaged in a combination or conspiracy for the purpose of fixing, controlling or maintaining prices in the Relevant Market within the State of Illinois.

183.    Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in Illinois and are entitled to all forms of relief, including recovery of treble damages.

## COUNT X
## VIOLATION OF IOWA COMPETITION LAW,
## IOWA CODE ANN. §§ 553.1, *et seq.*

184.    The Iowa Competition Law provides that "A contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market." Iowa Code §553.4.

185.    Under Iowa law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449-51 (Iowa 2002).

186.    Members of the Class purchased Pepsi soft drinks within the State of Iowa during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

187.    Defendants contracted, combined or conspired to restrain or monopolize trade in the Relevant Market in Iowa in violation of Iowa Code Ann. Sections 553.1, *et seq.*

188.    Defendants' violations are willful and flagrant.

189.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in Iowa, and are entitled to all forms of relief, including exemplary damages for willful conduct.

## COUNT XI
## VIOLATION OF KANSAS RESTRAINT OF TRADE ACT,
## KAN. STAT. ANN. §§ 50-101, *et seq.*

190.    Kansas Restraint of Trade Act provides that "[a] trust is a combination of capital, skills, or acts by two or more persons . . . [t]o create or carry out restrictions in trade or commerce, or aids to commerce, or to carry out restrictions in the full and free pursuit of any business authorized or permitted by the laws of this state." Kan. Stat. Ann. §50-101. It

further states that "[n]o person…within the state of Kansas shall conspire or combine with any other persons, within or without the state for the purpose of monopolizing any line of business." Kan. Stat. Ann. § 50-132 (2016).

191.    Members of the Class purchased Pepsi soft drinks within the State of Kansas during the Class Period.

192.    But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

193.    Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann. § 50-161(b).

194.    Defendants combined capital, skills or acts for the purposes of creating restrictions in trade or commerce in the Relevant Market, increasing the price of Pepsi soft drinks, or preventing competition in the sale of Pepsi soft drinks, in a manner that established the price of Pepsi soft drinks and precluded free and unrestricted competition among themselves in the sale of Pepsi soft drinks, in violation of Kan. Stat. Ann. Sections 50-101, *et seq.*

195.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in Kansas and are entitled to all forms of relief, including recovery of treble damages.

### COUNT XII
### VIOLATION OF MAINE MONOPOLIES AND PROFITEERING LAW, ME. STAT. TIT. 10, §§ 1101, *et seq.*

196.    Part 3 of Title 10 of the Maine Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade. *See* ME. STAT. tit. 10, §§ 1101-1102.

197.     Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Maine during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

198.     Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Stat. tit. 10, § 1104.1.

199.     Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Maine in violation of Me. Stat. tit. 10, Sections 1101, *et seq*.

200.     Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in Maine and are entitled to all forms of relief, including recovery of treble damages.

## COUNT XIII
## VIOLATION OF MARYLAND ANTITRUST ACT,
## MD. CODE, COM. LAW §§ 11-201, *et seq.*

201.     Maryland antitrust act makes it unlawful to, *inter alia*, "[b]y contract, combination, or conspiracy with one or more persons, unreasonably restrain trade or commerce." Md. Code, Com. Law § 11-204(a)(1).

202.     The purpose of Maryland's antitrust statute is "to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices." Md. Code, Com. Law § 11-202(a)(1).

203.     Under Maryland law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Md. Code, Com. Law § 11-209(b)(2).

204.     Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Maryland in violation of

44

Md. Code Ann. Com. Law § 11-204(a).

205.     Members of the Class were injured with respect to purchases of Pepsi soft

drinks in Maryland and are entitled to all forms of relief, including recovery of treble damages.

## COUNT XIV
## VIOLATION OF MICHIGAN ANTITRUST REFORM ACT,
### MICH. COMP. LAWS ANN. §§ 445.771, *et seq.*

206.     Michigan Antitrust Reform Act declares unlawful "[a] contract, combination,

or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce

in a relevant market." Mich. Comp. Laws Ann. §445.772.

207.     Plaintiffs and members of the Class purchased Pepsi soft drinks within the

State of Michigan during the Class Period. But for Defendants' conduct set forth herein, the

price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

208.     Under Michigan Antitrust Reform Act, indirect purchasers have standing to

maintain an action based on the facts alleged in this complaint. Mich. Comp. Laws Ann. §

445.778(2).

209.     Defendants contracted, combined, or conspired to restrain or monopolize

trade or commerce in the Relevant Market in violation of Mich. Comp. Laws Ann. § 445.772.

210.     Defendants' conduct is flagrant.

211.     Plaintiffs and members of the Class were injured with respect to purchases

of Pepsi soft drinks in Michigan and are entitled to all forms of relief, including recovery of

treble damages.

## COUNT XV
## VIOLATION OF MINNESOTA ANTITRUST LAW,
### MINN. STAT. ANN. §§ 325D.49, *et seq.*

212.     Minnesota Antitrust Law prohibits "any contract, combination or

conspiracy when any part thereof was created, formed, or entered into in [Minnesota]; and any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power; whenever any of the foregoing affects the trade or commerce of [Minnesota]." Minn. Stat. Ann. § 325D.54.

213.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

214.    Under the Minnesota Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. Ann. § 325D.57.

215.    Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the Relevant Market, within the intrastate commerce in and outside of Minnesota in violation of Minn. Stat. Ann. Sections 325D.49, *et seq*.

216.    Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in Minnesota and are entitled to all forms of relief, including recovery of treble damages.

## COUNT XVI
## VIOLATION OF MISSISSIPPI ANTITRUST STATUTE, MISS. CODE ANN. §§ 75-21-1, *et seq.*

217.    Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, stating that "[t]his chapter shall be liberally construed in all courts to the end that trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

218.     "A trust or combine is a combination, contract, understanding or agreement, express or implied . . . when inimical to the public welfare" and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. § 75-21-1.

219.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Mississippi.

220.     Defendants sold Pepsi soft drinks within Mississippi.

221.     Members of the Class purchased Pepsi soft drinks within the State of Mississippi during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

222.     Under Mississippi law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

223.     Defendants combined, contracted, understood, and agreed in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of Pepsi soft drinks and hindering competition in the sale of Pepsi soft drinks, in violation of Miss. Code Ann. Sections 75-21-1, *et seq*.

224.     Pepsi soft drinks are sold indirectly via retailers throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

225.     Defendants' unlawful conduct substantially affected Mississippi's trade and commerce and Defendants' unlawful conduct occurred in substantial part in Mississippi by fixing the prices charged by retailers for Pepsi soft drinks in Mississippi.

226.     Members of the Class were injured with respect to purchases of Pepsi soft drinks in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

## COUNT XVII
## VIOLATION OF NEBRASKA JUNKIN ACT,
## NEB. REV. STAT. §§ 59-801, *et seq.*

227.     Chapter 59 of the Nebraska Revised Statutes generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

228.     Members of the Class purchased Pepsi soft drinks within the State of Nebraska during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

229.     Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

230.     Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Nebraska in violation of Neb. Rev. Stat. Sections 59-801, *et seq.*

231.     Members of the Class were injured with respect to purchases of Pepsi soft drinks in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained.

## COUNT XVIII
## VIOLATION OF NEVADA UNFAIR TRADE PRACTICES ACT,
## NEV. REV. STAT. ANN. §§ 598A.010, *et seq.*

232.     Nevada Unfair Trade Practices Act ("NUTPA") states that "free, open and

48

competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1)(a).

233.    The policy of NUTPA is to "[p]rohibit acts in restraint of trade or commerce," "[p]reserve and protect the free, open and competitive market," and "[p]enalize all persons engaged in [] anticompetitive practices." Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, *inter alia*, price fixing, division of markets, allocation of customers, and monopolization of trade. *See* Nev. Rev. Stat. Ann. § 598A.060(1).

234.    Members of the Class purchased Pepsi soft drinks within the State of Nevada during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

235.    Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. § 598A.210(2).

236.    Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Nevada in violation of Nev. Rev. Stat. Ann. Section 598A.060.

237.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in Nevada in that at least thousands of sales of Pepsi soft drinks took place in Nevada, purchased by Nevada consumers at supracompetitive prices caused by Defendants' conduct.

238.    Accordingly, members of the Class are entitled to all forms of relief, including recovery of treble damages.

## COUNT XIX
## VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE,
### N.H. REV. STAT. ANN. §§ 356:1, *et seq.*

239.    Title XXXI of the New Hampshire Statutes generally governs trade and commerce.

240.    Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. *See* N.H. Rev. Stat. Ann. §§ 356:2-356:3.

241.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of New Hampshire during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

242.    Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11.

243.    Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of New Hampshire in violation of N.H. Rev. Stat. Ann. Sections 356:1, *et seq.*

244.    Defendant's violations are willful and flagrant.

245.    Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in New Hampshire and are entitled to all forms of relief, including recovery of treble damages.

## COUNT XX
## VIOLATION OF NEW JERSEY ANTITRUST ACT,
### N.J. STAT. ANN. §§ 56:9-1, *et seq.*

246.    New Jersey Antitrust Act declares unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce [in the State]" or monopolies in the relevant market within the State. N.J. Stat. Ann. §§ 56:9-3 and 56:9-4.

247.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of New Jersey during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

248.    Under New Jersey law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.J. Stat. Ann. § 56:9-12.

249.    Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of New Jersey in violation of N.J. Stat. Ann. § 56:9-1, *et seq*.

250.    Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in New Jersey and are entitled to all forms of relief under the New Jersey Antitrust Act.

## COUNT XXI
## VIOLATION OF NEW MEXICO ANTITRUST ACT,
## N.M. STAT. ANN. §§ 57-1-1, *et seq.*

251.    The New Mexico Antitrust Act aims to "prohibit[] restraints of trade and monopolistic practices." N.M. Sta. Ann. § 57-1-15.

252.    Members of the Class purchased Pepsi soft drinks within the State of New Mexico during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

253.    Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.M. Stat. Ann. § 57-1-3.

254.    Defendants contracted, agreed, combined or conspired in restraint of trade in the Relevant Market within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. Sections 57-1-1, *et seq*.

255.     Members of the Class were injured with respect to purchases of Pepsi soft drinks in New Mexico and are entitled to all forms of relief, including recovery of treble damages.

## COUNT XXII
## VIOLATION OF NEW YORK DONNELLY ACT,
## N.Y. GEN. BUS. LAW §§ 340, *et seq.*

256.     Section 340 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. *See* N.Y. Gen. Bus. Law § 340(1).

257.     Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of New York during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

258.     Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.Y. Gen. Bus. Law § 340(6).

259.     Defendants restrained competition in the free exercise of the conduct of the business in the Relevant Market within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law Sections 340, *et seq.*

260.     Defendants' unlawful conduct substantially affected New York's trade and commerce and Defendants' unlawful conduct occurred in substantial part in New York by fixing the prices charged by retailers for Pepsi soft drinks in New York.

261.     Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in New York and are entitled to all forms of relief under N.Y. Gen. Bus. Law Section 340(5), including recovery of treble damages.

## COUNT XXIII
## VIOLATION OF NORTH CAROLINA ANTITRUST STATUTE,
### N.C. GEN. STAT. ANN. §§ 75-1, *et seq.*

262.     Chapter 75 of the North Carolina General Statutes generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization. *See* N.C. Gen. Stat. Ann. §§ 75-1 and 75-2.1.

263.     Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Lab'ys, Inc.*, 473 S.E.2d 680, 687-88 (N.C. Ct. App. 1996).

264.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within North Carolina because Defendants' agreement fixed the retail prices of Pepsi soft drinks in North Carolina, both before and after they were imported into North Carolina.

265.     Defendants' unlawful conduct substantially affected North Carolina's intrastate trade and commerce.

266.     As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

267.     By reason of the foregoing, members of the Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. Ann. Sections 75-1, *et seq.*

## COUNT XXIV
## VIOLATION OF NORTH DAKOTA UNIFORM STATE ANTITRUST ACT, N.D. CENT. CODE ANN. §§ 51-08.1-01, *et seq.*

268.    North Dakota Uniform State Antitrust Act prohibits "[a] contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in a relevant market." *See* N.D. Cent. Code Ann. § 51-08.1-02.

269.    Members of the Class purchased Pepsi soft drinks within the State of North Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

270.    Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code Ann. § 51-08.1-08(4).

271.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within North Dakota.

272.    Defendants' violations of North Dakota law were flagrant.

273.    Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

274.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class were injured with respect to purchases in North Dakota and are threatened with further injury, and are entitled to all forms of relief under N.D. Cent. Code Ann. Sections 51-08.1-01, *et seq.,* including recovery of treble damages.

## COUNT XXV
## VIOLATION OF OREGON ANTITRUST LAW,
## OR. REV. STAT. ANN. §§ 646.705, *et seq.*

275.    Oregon Antitrust Law govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." Or. Rev. Stat. Ann. § 646.715(1). The statute declares unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" as well as monopolization or combination or conspiracy to monopolize any part of trade or commerce. Or. Rev. Stat. Ann. §§ 646.725-646.730.

276.    Members of the Class purchased Pepsi soft drinks within the State of Oregon during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

277.    Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. Ann. § 646.780(1)(a).

278.    Defendants contracted, combined, or conspired in restraint of trade or commerce in the Relevant Market in violation of Or. Rev. Stat. Ann.  §§ 646.725-646.730.

279.    Members of the Class were injured with respect to purchases of Pepsi soft drinks within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including recovery of treble damages.

## COUNT XXVI
## VIOLATION OF PUERTO RICO ANTI-MONOPOLY ACT,
## P.R. LAWS ANN. TIT. 10, §§ 257, *et seq.*

280.    The provisions of the Puerto Rican Anti-Monopoly Act of 1964 (the AMA)

parallel Sections 1 and 2 of the Sherman Act, and other federal statutes. Those provisions are supplemented by The Regulation on Fair Competition Number VII, which proscribes certain conduct including the type engaged in by Defendants more fully described above.

281.    The Act declares declare unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy in unreasonable restraint of trade or commerce in the Commonwealth of Puerto Rico or in any section thereof" or monopolization or attempt to monopolize any part of the trade or commerce in the Commonwealth of Puerto Rico. P.R. LAWS ANN. tit. 10, §§ 258, 260.

282.    Under Puerto Rican law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Gov't of Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464, 478 (D.P.R. 2020).

283.    Members of the class purchased Pepsi soft drinks within Puerto Rico during the class period. But for Defendants' conduct set forth herein, the price of those Pepsi soft drinks would have been lower, in an amount to be determined at trial.

284.    By reason of the foregoing, members of the class are entitled to seek all forms of relief available, including recovery of treble damages. P.R. LAWS ANN. tit. 10, § 268.

**COUNT XXVII**
**VIOLATION OF RHODE ISLAND ANTITRUST ACT,**
**6 R.I. GEN. LAWS ANN. §§ 6-36-1, *et seq.***

285.    Rhode Island Antitrust Act aims "[t]o promote the unhampered growth of commerce and industry throughout [Rhode Island] by prohibiting unreasonable restraints of trade and monopolistic practices" that hamper, prevent or decrease competition. 6 R.I. Gen. Laws Ann. § 6-36-2(a)(2).

286.     Members of the class purchased Pepsi soft drinks within the State of Rhode Island during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

287.     Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. 6 R.I. Gen. Laws Ann. § 6-36-11(a).

288.     Defendants contracted, combined and conspired in restraint of trade in the Relevant Market within the intrastate commerce of Rhode Island in violation of 6 R.I. Gen. Laws Ann. Sections 6-36-1, *et seq.*

289.     Members of the Class were injured with respect to purchases of Pepsi soft drinks in Rhode Island and are entitled to all forms of relief, including recovery of treble damages.

**COUNT XXVIII**
**VIOLATION OF SOUTH DAKOTA ANTITRUST STATUTE,**
**S.D. CODIFIED LAWS §§ 37-1-3.1, *et seq.***

290.     Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices. S.D. Codified Laws §§ 37-1-3.1 to 37-1-3.2.

291.     Members of the Class purchased Pepsi soft drinks within the State of South Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

292.     Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. *See* S.D. Codified Laws § 37-1-33.

293.     Defendants contracted, combined or conspired in restraint of trade or

57

commerce in the Relevant Market within the intrastate commerce of South Dakota in violation of S.D. Codified Laws §§ 37-1-3.1, *et seq.*

294.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in South Dakota and are entitled to all forms of relief, including recovery of treble damages.

### COUNT XXIX
### VIOLATION OF TENNESSEE TRADE PRACTICES ACT,
### TENN. CODE ANN. §§ 47-25-101, *et seq.*

295.    Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, *inter alia*, "[a]ll arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition" in goods in Tennessee. All such "arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void." *See* TENN. CODE ANN. § 47-25-101.

296.    Under Tennessee law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Tenn. Code Ann. §47-25-106(a).

297.    Defendants competed unfairly and colluded by meeting to fix prices and otherwise restrain trade as set forth herein, in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*

298.    During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce as Pepsi soft drinks were sold in Tennessee.

299.    A substantial part of Defendants illegal conduct occurred within Tennessee because Defendants' agreement fixed the retail prices of Pepsi soft drinks in Tennessee, both

before and after they were imported into Tennessee.

300.    Members of the Class purchased Pepsi soft drinks within the State of Tennessee during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

301.    As a direct and proximate result of Defendant's unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

302.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in Tennessee and are entitled to all forms of relief available under the law, including actual damages.

## COUNT XXX
### VIOLATION OF UTAH ANTITRUST ACT, UTAH CODE ANN. §§ 76-16-501, *et seq.*

303.    Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce." Utah Code Ann. § 76-16-502(1)(b).

304.    Members of the Class purchased Pepsi soft drinks within the State of Utah during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

305.    Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-16-509(2).

306.    Defendants contracted, combined or conspired in restraint of trade or

commerce in the Relevant Market in violation of Utah Code Ann. § 76-16-510.

307.    Members of the Class who are either Utah residents or Utah citizens were injured with respect to purchases of Pepsi soft drinks in Utah and are entitled to all forms of relief, including recovery of treble damages.

**COUNT XXXI**
**VIOLATION OF WEST VIRGINIA ANTITRUST ACT,**
**W. VA. CODE ANN. §§ 47-18-1, *et seq.***

308.    West Virginia Antitrust Act prohibits contract, combination, or conspiracy in restraint of trade or commerce in the State and prohibits the "maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within [the] State, by any persons for the purpose of excluding competition or controlling, fixing or maintaining prices". W. Va. Code §§ 47-18-3, 47-18-4.

309.    During the Class Period, Defendants engaged in anticompetitive conduct alleged above, including a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia in violation of W. Va. Code Sections 47-18-3.

310.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within West Virginia, in violation of in violation of W. Va. Code Sections 47-18-4.

311.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of West Virginia during the Class Period. But for Defendant's conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

312.    Under West Virginia law, indirect purchasers have standing to maintain an

action based on the facts alleged in this Complaint. W. Va. Code Ann. § 47-18-9.

313.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

314.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property in that they paid more for Pepsi soft drinks than they otherwise would have paid in the absence of Defendants' unlawful conduct.

315.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in West Virginia and are entitled to all forms of relief available under the law, including actual damages.

## COUNT XXXII
## VIOLATION OF WISCONSIN ANTITRUST ACT,
## WIS. STAT. ANN. §§ 133.01, *et seq.*

316.    Wisconsin Antitrust Act governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. Ann. § 133.01.

317.    Members of the class purchased Pepsi soft drinks within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

318.    Under Wisconsin law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Wis. Stat. Ann. § 133.18.

319.    Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market, with the intention of injuring or destroying competition

therein, in violation of Wis. Stat. Ann. §§ 133.01, *et seq*.

320.    Members of the Class were injured with respect to purchases of Pepsi soft drinks in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for Pepsi soft drinks in Wisconsin.

321.    Accordingly, members of the Class are entitled to all forms of relief, including recovery of treble damages.

## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

322.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

323.    Defendants' Scheme and conduct constitutes unfair competition, unconscionable conduct, and deceptive acts and practices in violation of the state consumer protection statutes set forth below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, and/or unconscionable acts or practices, Plaintiffs and members of the Class paid higher prices for Pepsi soft drinks than they should have.

324.    The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiff and Class members could not reasonably have avoided injury from Defendants' wrongful conduct.

325.    Plaintiffs and members of the Class purchased goods, namely Pepsi soft drinks, primarily for personal, family, or household purposes.

326.    There was and is a gross disparity between the price that Plaintiffs and the Class members paid for Pepsi soft drinks and the value they received.

327.    Plaintiffs plead the following Thirty-Three through Fifty-Two Claims under the consumer protection or similar laws of each State or jurisdiction identified below.

## COUNT XXXIII
## VIOLATION OF ARKANSAS DECEPTIVE TRADE PRACTICES ACT, ARK. CODE ANN. §§ 4-88-101, *et seq.*

328.      Arkansas Deceptive Trade Practices Act (the "ADTPA") forbids certain enumerated "[d]eceptive and unconscionable trade practices," as well as "any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code §§4-88-107(a).

329.      Indirect purchasers have standing to maintain an action under the ADTPA based on the facts alleged in this Complaint. *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.,* 350 F. Supp. 2d 160, 178-79 (D. Me. 2004).

330.      Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Arkansas during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

331.      Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Arkansas.

332.      The aforementioned conduct by Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10).

333.      Defendants' unlawful conduct substantially affected Arkansas's trade and commerce.

334.      As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property by being forced to pay more for Pepsi soft drinks than they otherwise would have paid in the absence of Defendants' unlawful conduct.

335.    Accordingly, Plaintiffs and members of the Arkansas Class seek all forms of relief available under Ark. Code Ann. § 4-88-113(f).

### COUNT XXXIV
### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200, *et seq.*

336.    The violations of federal antitrust law set forth above also constitute violations of Section 17200, *et seq.*, of the California Business and Professions Code (the "UCL").

337.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

338.    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated the UCL.

339.    Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above.

340.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

341.      Plaintiffs and members of the Class are entitled to, *inter alia*, full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

342.      The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

343.      The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause members of the Class to pay supracompetitive and artificially-inflated prices for Pepsi soft drinks sold in the State of California. Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

344.      As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiffs and the members of the Class are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code Sections 17203 and 17204.

**COUNT XXXV**
**VIOLATION OF DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT, D.C. CODE ANN. §§ 28-3901, *et seq.***

345.      Members of the Class purchased Pepsi soft drinks for personal, family, or household purposes.

346.      By reason of the conduct alleged herein, Defendants have violated D.C. Code Ann. §§ 28-3901, *et seq.*

347.      Defendants are "merchants" within the meaning of D.C. Code Ann. § 28-

3901(a)(3).

348.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within the District of Columbia.

349.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

350.    Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

351.    As a direct and proximate cause of defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

352.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief under D.C. Code Ann. §§ 28-3901, *et seq.*

## COUNT XXXVI
## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. ANN. §§ 501.201(2), *et seq.*

353.    Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Fla. Stat. Ann. § 501.204(1).

354.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. § 501.202(2).

355.    Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this complaint. *See* Fla. Stat. Ann. § 501.211(1) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

356.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

357.    Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Florida.

358.    Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

359.    Defendants' unlawful conduct substantially affected Florida's trade and commerce.

360.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property by virtue of being forced to pay overcharges on Pepsi soft drinks.

361.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief under Fla. Stat. Ann. §§501.201-.213.

## COUNT XXXVII
## VIOLATION OF HAWAII UNFAIR OR DECEPTIVE TRADE PRACTICES ACT, HAW. REV. STAT. ANN. §§ 480-2, *et seq.*

362.    Hawaii's unfair competition statute prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

67

Haw. Rev. Stat. Ann. § 480-2(a).

363.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Hawaii during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

364.    Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Hawaii.

365.    Accordingly, Defendants' anticompetitive Scheme, which is described above, constitutes an unfair method of competition, or unfair, unconscionable, or deceptive acts or practices, in violation of the Haw. Rev. Stat. Ann. §§ 480-2, *et seq*.

366.    Defendants' unlawful conduct substantially affected Hawaii's trade and commerce.

367.    Plaintiffs and members of the Class are entitled to seek all available relief under Hawaii Unfair or Deceptive Trade Practices Act.

## COUNT XXXVIII
## VIOLATION OF IDAHO CONSUMER PROTECTION ACT,
## IDAHO CODE §§ 48-601, *et seq.*

368.    Idaho Consumer Protection Act (the "ICPA") prohibits "unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce," Idaho Code § 48-601, which includes, among other things, "any unconscionable method, act or practice in the conduct of any trade or commerce." Idaho Code § 48-603C(1).

369.    Defendants' anticompetitive efforts, which are described above, constituted an unfair method of competition, or an unconscionable practice, under the ICPA.

370.    Defendants' intentionally engaged in the above conduct in order to reduce

68

competition in the Relevant Market.

371.    Defendants' alleged conduct would outrage or offend the public conscious.

372.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Idaho during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

373.    Defendants' conduct was the proximate cause of injuries to members of the Class, namely in the form of overcharges for Pepsi soft drinks.

374.    Plaintiffs and members of the Class are entitled to seek actual damages, along with any other form of relief that the Court deems proper under the ICPA, including actual damages. *See* Idaho Code § 48-608.

## COUNT XXXIX
## VIOLATION OF KANSAS CONSUMER PROTECTION STATUTE, KAN. STAT. ANN., §§ 50-623, *et seq.*

375.    Members of the Class purchased Pepsi soft drinks for personal, family,  or household purposes.

376.    By reason of the conduct alleged herein, Defendants have violated Kan. Stat. Ann. §§ 50-626-627.

377.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Kansas.

378.    Defendants' conduct constituted deceptive or unconscionable act or practice in connection with consumer transactions in Kansas.

379.    Defendants' unlawful conduct substantially affected Kansas's trade and commerce.

380.     As a direct and proximate cause of defendants' unlawful conduct, members of the Class have been injured by paying an overcharge for Pepsi soft drinks.

381.     By reason of the foregoing, members of the Class are entitled to seek all forms of relief under Kan. Stat. Ann. §§ 50-623, *et seq.*

**COUNT XL**
**VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT,**
**ME. REV. STAT. ANN. TIT. 5, §§ 205A-214.**

382.     Members of the Class purchased Pepsi soft drinks for personal, family,  or household purposes.

383.     By reason of the conduct alleged herein, Defendants have violated Me. Rev. Stat. Ann. tit. 5, §207.

384.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Maine.

385.     Defendants' conduct constituted unfair method of competition and unfair or deceptive acts or practices in the conduct of trade or commerce in Maine.

386.     Defendants' unlawful conduct substantially affected Maine's trade and commerce.

387.     As a direct and proximate cause of defendants' unlawful conduct, members of the Class have been injured been injured by paying an overcharge for Pepsi soft drinks..

388.     By reason of the foregoing, members of the Class are entitled to seek all forms of relief under Me. Rev. Stat. Ann. tit. 5, §205A to 214.

## COUNT XLI
## VIOLATION OF MASSACHUSETTS CONSUMER PROTECTION ACT, MASS. GEN. LAWS, CH. 93A, §§ 1, *et seq.*

389.    By reason of the conduct alleged herein, including the violation of federal antitrust laws, Defendants have violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws, ch. 93A, §§ 1 *et seq.*

390.    Plaintiffs and members of the Class purchased Pepsi soft drinks within the Commonwealth of Massachusetts during the Class Period. But for Defendants' conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

391.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Massachusetts.

392.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the Commonwealth of Massachusetts.

393.    Defendants' unlawful conduct substantially affected Massachusetts' trade and commerce.

394.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property by being forced to pay overcharges on Pepsi soft drinks.

395.    By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief under Mass. Gen. Laws ch. 93A, § 9.

## COUNT XLII
## VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT,
### MO. REV. STAT. §§ 407.010, *et seq.*

396.     Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

397.     Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Missouri for personal, family, or household purposes during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

398.     Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007).

399.     Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the conduct of commerce in Missouri in violation of Mo. Rev. Stat. §§ 407.010, *et seq.*

400.     Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in Missouri and are entitled to all forms of relief under Mo. Rev. Stat. §§ 407.010, *et seq.*

## COUNT XLIII
## VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER
### PROTECTION ACT OF 1970,
### MONT. CODE ANN. §§ 30-14-103, *et seq.*, 30-14-201, *et seq.*

401.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §§ 30-14-103, *et seq.*, 30-14-201, *et seq.*

402.     Defendants' unlawful conduct had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated throughout Montana; (2) Pepsi soft drinks' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for Pepsi soft drinks; (5) retailers in Montana were prevented from charging a competitive price for Pepsi soft drinks.

403.     Plaintiffs and members of the Class purchased goods, namely Pepsi soft drinks, primarily for personal, family, or household purposes.

404.     During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

405.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code §§ 30-14-103, *et seq.*, 30-14-201, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNT XLIV**
**VIOLATION OF NEBRASKA CONSUMER PROTECTION ACT,**
**NEB. REV. STAT. §§ 59-1601, *et seq.***

406.     By reason of the conduct alleged herein, Defendants have violated Neb. Rev. Stat. §§ 59-1601, *et seq*.

407.     Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Nebraska.

73

408.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

409.     Defendants' conduct had a direct or indirect impact upon Plaintiffs and members-of-the-Class's ability to protect themselves.

410.     Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

411.     As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

412.     By reason of the foregoing, members of the Class are entitled to seek all forms of relief available under Nebraska Consumer Protection Act.

## COUNT XLV
## VIOLATION OF NEVADA DECEPTIVE TRADE PRACTICES ACT, NEV. REV. STAT. §§ 598.0903, *et seq.*

413.     By reason of the conduct alleged herein, Defendants have violated Nev. Rev. Stat. §§ 598.0903, *et seq.*

414.     Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

415.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Nevada.

416.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

417.     Defendants' conduct amounted to a fraudulent act or practice committed by

a supplier in connection with a consumer transaction.

418.    Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

419.    Defendants' violations are willful.

420.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Class have been injured in their business or property and are threatened with further injury.

421.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief under Nev. Rev. Stat. § 598.0993.

**COUNT XLVI**
**VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT,**
**N.H. REV. STAT. ANN, TIT. XXXI §§ 358-A:1, *et seq.***

422.    By reason of the conduct alleged herein, defendants have violated N.H. Rev. Stat. Ann., tit. XXXI §§ 358-A:1, *et seq*.

423.    Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *See LaChance v. U.S. Smokeless Tobacco Co.*, 931 A.2d 571, 575-582 (N.H. 2007).

424.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within New Hampshire. Defendants' unlawful conduct occurred in substantial part in New Hampshire by fixing the prices charged by retailers for Pepsi soft drinks in New Hampshire.

425.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

75

426.     Defendants' violations are willful and knowing.

427.     Defendants' conduct had a direct or indirect impact upon members of the Class's ability to protect themselves.

428.     Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

429.     As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

430.     By reason of the foregoing, members of the Class are entitled to seek all forms of relief available under N.H. Rev. Stat. Ann., tit. XXXI § 358-A:10.

**COUNT XLVII**
**VIOLATION OF NEW MEXICO UNFAIR PRACTICES ACT,**
**N.M. STAT. ANN. §§ 57-12-1, *et seq.***

431.     By reason of the conduct alleged herein, Defendants have violated N.M. Stat. Ann. §§ 57-12-3, *et seq.*

432.     Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within New Mexico.

433.     Defendants' conduct was unfair, deceptive, or unconscionable within the conduct of commerce within the State of New Mexico.

434.     Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

435.     Defendants' conduct constituted "unconscionable trade practices" in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Class

members and the price paid by them for Pepsi soft drinks as set forth in N.M. Stat. Ann. § 57-12-2E.

436.     Defendants' violations are willful.

437.     As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

438.     By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including treble damages under N.M. Stat. Ann. § 57-12-10.

## COUNT XLVIII
## VIOLATION OF NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT,
## N.C. GEN. STAT. ANN. §§ 75-1.1, *et seq.*

439.     By reason of the conduct alleged herein, Defendants have violated N.C. Gen. Stat. Ann. §§ 75-1.1, *et seq.*

440.     Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Laby's, Inc.*, 473 S.E.2d 680, 687-88 (N.C. Ct. App. 1996).

441.     Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within North Carolina.

442.     Defendants' conduct constituted unfair method of competition or unfair or deceptive acts or practices within the conduct of commerce within the State of North Carolina.

443.     Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

444.     Defendants' conduct constitutes consumer-oriented deceptive acts or

practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

445.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

446.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. Ann. § 75-16.

## COUNT XLIX
## VIOLATION OF RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT, R.I. GEN. LAWS §§ 6-13.1-1, *et seq.*

447.    By reason of the conduct alleged herein, Defendants have violated R.I. Gen. Laws §§ 6-13.1-1, *et seq*.

448.    Defendants engaged in unfair or deceptive acts or practices with the intent to injure competitors and consumers through supracompetitive profits.

449.    Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Rhode Island.

450.    Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

451.    Defendants' violations are willful.

452.    Members of the Class purchased goods, namely Pepsi soft drinks, primarily for personal, family, or household purposes.

453.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

454.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief under R.I. Gen. Laws § 6-13.1-5.2.

## COUNT L
## VIOLATION OF SOUTH CAROLINA'S UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §§ 39-5-10, *et seq.*

455.    By reason of the conduct alleged herein, Defendants have violated S.C. Code Ann. §§ 39-5-10, *et seq*.

456.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within South Carolina.

457.    Defendants' conduct constituted unfair method of competition or unfair or deceptive acts or practices within the conduct of commerce in South Carolina.

458.    Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

459.    Defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as at least thousands of members of the public purchase Pepsi soft drinks.

460.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief under S.C. Code Ann. §§ 39-5-10, *et seq*.

## COUNT LI
## VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT,
## UTAH CODE ANN. §§ 13-11-1, *et seq.*

461.     By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §§ 13-11-1, *et seq.*

462.     Defendants are a supplier within the meaning of Utah Code Ann. § 13-11-3(5).

463.     Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Utah.

464.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

465.     Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions within the meaning of Utah Code Ann. § 13-11-3.

466.     Defendants knew or had reason to know that their conduct was unconscionable.

467.     Defendants' unlawful conduct substantially affected Utah's trade and commerce.

468.     Members of the Class purchased goods, namely Pepsi soft drinks, primarily for personal, family, or household purposes.

469.     As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

470.     By reason of the foregoing, members of the Class are entitled to seek all forms of relief under Utah Code Ann. § 13-11-19.

## COUNT LII
## VIOLATION OF VERMONT CONSUMER FRAUD ACT,
## VT. STAT. ANN. TIT. 9, §§ 2451, *et seq.*

471.     By reason of the conduct alleged herein, Defendants have violated VT. Stat. Ann. tit. 9, §§ 2451, *et seq.*

472.     Vermont Consumer Fraud Act prohibits unfair methods of competition: "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are hereby declared unlawful." Vt. Stat. Ann. tit. 9, §2453(a).

473.     Plaintiffs and members of the Class purchased Pepsi soft drinks within the State of Vermont during the Class Period. But for Defendants' conduct set forth herein, the price of Pepsi soft drinks would have been lower, in an amount to be determined at trial.

474.     Under Vermont law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Vt. Stat. Ann. tit. 9, § 2465(b).

475.     Defendants competed unfairly by restraining trade as set forth herein, in violation of Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*

476.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Vermont.

477.     Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

478.     Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

479. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

480. Plaintiffs and members of the Class were injured with respect to purchases of Pepsi soft drinks in Vermont and are entitled to all forms of relief under Vt. Stat. Ann. tit. 9, §2465(a).

## XIII.  PETITION FOR RELIEF

Plaintiffs petition for the following relief:

a. a determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiffs be appointed as class representatives, and that Plaintiffs' counsel be appointed as class counsel;

b. a determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Antitrust Act and the relevant Repealer Jurisdictions' laws;

c. a judgement and order requiring the Defendants to pay damages to Plaintiffs and members of the proposed Class;

d. an order enjoining the Defendants from engaging in further unlawful conduct;

e. an award of attorneys' fees and costs;

f. an award of pre- and post- judgement interest on all amounts awarded; and

g. such other and further relief as the Court deems just and equitable.

## XIV.  JURY TRIAL DEMAND

Plaintiffs and members of the Class demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

Dated: January 14, 2026                    Respectfully submitted,

                                            */s/ Alexander W. Cogbill*
                                            Alexander W. Cogbill
                                            **ZELLE LLP**
                                            45 Broadway, Suite 920
                                            New York, NY 10006
                                            Telephone: (646) 876-4420
                                            acogbill@zellelaw.com

                                            Christopher T. Micheletti (*pro hac vice* forthcoming)
                                            Qianwei Fu (*pro hac vice* forthcoming)
                                            **ZELLE LLP**
                                            555 12th Street, Suite 1230
                                            Oakland, CA 94607
                                            Telephone: (415) 693-0700
                                            cmicheletti@zellelaw.com
                                            qfu@zellelaw.com

                                            *Counsel for Plaintiffs Cassidy Lee, Carla Lown,*
                                            *Frederick Rozo, and Galina Wind, and Proposed*
                                            *Lead Counsel for Indirect Purchaser Class*